## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY – FRANKFORT DIVISION

| | | |
|---|---|---|
| **SHERRY MCLAUGHLIN,** | : | Case No. _____ |
| **in her individual capacity and as guardian** | | |
| **of A.M., a minor** | : | |
| | | |
| Plaintiffs | : | |
| | | |
| v. | : | |
| | | |
| **WILSON CLAY "CASEY" JAYNES,** | : | |
| *in his individual and official capacity* | | |
| 813 Hawkins St. | : | **PLAINTIFFS' VERIFIED COMPLAINT** |
| Carrollton, KY 41008 | | **WITH JURY DEMAND ENDORSED** |
| | : | **HEREON** |
| and | | |
| | : | |
| **BRANDI MCINTYRE**, *in her individual* | | |
| *and official capacity* | : | |
| 408 5th St. | | |
| Carrollton, KY 41008 | : | |
| | | |
| and | : | |
| | | |
| **JENNA STEVENS**, *in her individual* | : | |
| *and official capacity* | | |
| 813 Hawkins St. | : | |
| Carrollton, KY 41008 | | |
| | : | |
| and | : | |
| | | |
| **ROBIN STEPHENSON** *in her individual* | : | |
| *and official capacity* | | |
| 813 Hawkins St. | : | |
| Carrollton, KY 41008 | | |
| | : | |
| and | : | |
| | | |
| **BOARD OF EDUCATION OF CARROLL** | : | |
| **COUNTY, KENTUCKY** | | |
| c/o Gwen Chapman, Chairwoman | : | |
| 908 7th St | | |
| Carrollton, KY 41008. | : | |
| | | |
| Defendants | : | |

1

Plaintiffs, Sherry McLaughlin, for herself and in her capacity as parent and guardian on behalf of A.M., her minor daughter, through Counsel, for their Complaint, state and allege as follows:

## Introduction

1. This case involves egregious instances of First Amendment retaliation, violations of Title IX, and Equal Protection. Sherry McLaughlin ("Sherry") was a highly involved mother, with multiple children in the Carroll County Schools system. Her daughter, A.M. ("A.M."), was sexually harassed and threatened with rape at a school dance by another student. In response, the school system kept A.M. in the classroom with the perpetrating student and, when Sherry attempted to protect A.M. by having the other student moved, the school retaliated by putting A.M. in the front office with no access to school work, denying A.M. access to instructional material when Sherry took her home until the situation resolved, and refused to take any action against the student, who was even in a group chat where he and other students talked about "raping and fucking" other students, including A.M.

2. The group chat was titled "Diddy Party," referencing Sean "Diddy" Combs, who – at the time – was facing several charges related to sexual misconduct, including prostitution, human trafficking, and other allegations of nonconsensual sexual conduct. Mr. Combs was convicted of the prostitution charges. The Defendants were aware of this egregiously titled group chat, but refused to act and fostered a culture in Carroll County Schools that encouraged students as young as 10 years old to engage in Diddy-esque conduct.

3. 10 year-old A.M. is traumatized by the sexual harassment, threatened sexual assault, and threatened rape. Due to the school's inaction, the student who harassed, threatened sexual assault, and threatened rape against A.M. began a harassment and bullying campaign against

A.M. upon learning that she and her mom had reported his egregious conduct, knowing that the school would do nothing, as they had done nothing in the past with repeated similar incidents.  This further rendered A.M. traumatized, requiring her to see a therapist, causing her to lose weight from the severe emotional distress and anxiety caused

4. Sherry then proceeded to file a Title IX complaint against the school for their inadequate response to the sexual harassment and threatened sexual assault of her daughter.  In retaliation against Sherry, Defendants concocted a knowingly false allegation that Sherry threatened a staff member and banned her from school grounds the day before dismissing her complaint, knowing about her extensive involvement in her children's extracurricular activities.  This complaint follows.

## Parties

5. Plaintiffs are residents and citizens of Carroll County, Kentucky, and the United States.

6. Defendant Wilson Clay "Casey" Jaynes ("Jaynes") is the Superintendent of Carroll County Schools, and was so acting in that capacity, and under color of law, by and between January 2025 to the present, including in his interactions with Plaintiffs.  He is sued in his individual and official capacities.

7. Defendant Brandy McIntyre ("McIntyre") is a counselor at Carroll County Middle School, and was so acting in that capacity, and under color of law, by and between January 2025 to the present, including in her false allegations against Sherry.  She is sued in his individual and official capacities.

8. Defendant Jenna Stevens ("Stevens") is the Title IX Coordinator at Carroll County Schools, and was so acting in that capacity, and under color of law, by and between January 2025 to the

present, including in her interactions with Plaintiffs.  She is sued in his individual and official capacities.

9. Defendant Robin Stephenson ("Stephenson") is the principal of Carroll County Middle School ("CCMS"), and was so acting in that capacity, and under color of law, by and between January 2025 to the present, including in her interactions with Plaintiffs.  She is sued in his individual and official capacities.

10. Defendant The Board of Education of Carroll County, Kentucky (the "Board"), is the duly elected body politic under KRS 160.160 responsible for administration of the Carroll County schools, and was and is a county school system within Kentucky, and is a recipient of substantial federal education funds, subjecting them to the requirements of Title IX, 20 U.S.C. §§ 1681-1688.

11. John and Jane Doe Defendants 1-5 are staff members at Carroll County schools and employed by the Board, and were so acting in that capacity, and under color of law, by and between January 2025 to the present, including in their interactions with Plaintiffs.  They are sued in their individual and official capacities.

## Jurisdiction and Venue

12. Subject matter jurisdiction over the federal claims and causes of action asserted by Plaintiffs in this case is conferred on this Court pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, 28 U.S.C. §1331, 28 U.S.C. §§ 2201 and 2202, 20 U.S.C. § 1681, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979), and other applicable law.

13. Venue in this district is proper pursuant to 28 U.S.C. §1391 and other applicable law.

14. Venue in this division is appropriate, since all of the deprivations of Plaintiffs' Constitutional Rights occurred in Carroll County, Kentucky, and Defendants reside in this District and Division.

**<u>Facts Common to all Claims</u>**

15. On or about January 30, 2025, ten-year-old A.M. attended her first CCMS dance at the middle school. The dance was for the 5th and 6th grade students. To be able to attend the dance, students had to stay after school.

16. The dance was from 3:30-5:30 p.m., on or about January 30, 2025, in the gymnasium. A.M. facetimed Sherry a few times, letting her know she was safe and with friends, in and out of the bathroom "getting ready" and heading to the gym to sit on the bleachers to await instructions for the dance.

17. At this time, A.M. is a happy, ten-year-old girl, who is looking forward to her first middle school dance. She is on the cheerleading team, a great student, and an all-around happy student.

18. On or about January 30, 2025, at the dance, a group of 5th grade girls approached A.M. and some of her friends, telling them that there was a group of boys who were threatening to rape 5th grade girls.

19. Disturbed, and having never before been confronted with this kind of behavior, A.M. went to Mr. Yager and reported what she had been told.

20. A.M. went back to her friend group after reporting this misconduct.

21. T.H., a fifth-grade male student who was part of the group of boys making the rape threats, then approached A.M., physically cornered her to prevent her ability to retreat, and said "I want to fuck you."

22. A.M. was stunned, she didn't know what to do or what to say, so then T.H. told her "I'll rape you then" while fiddling with the buttons on his shirt.

23. Terrified, A.M. ducked under T.H. and ran to Mr. Yager again, telling him that "[T.H.] said something really bad to me, something nasty and I am scared."

24. Video clearly corroborates what happened. While there is no audio, the video supports the notion that T.H. engaged in extreme, grossly offensive sexual harassment and rape threats against A.M. in front of other students.

25. Defendants' video of the dance depicts, at the 1:25:30 time mark, T.H. approaches the area where A.M. and her friends are, between the bleachers and the wall of the gym, who proceeds to watch A.M. from the bleachers.

26. At around the 1:25:57 time mark, T.H. approaches the group, and can be seen talking to A.M. At this point, T.H. can be seen tugging at his shirt, as if he is attempting to undo his shirt.

27. What T.H. said was so severe, A.M. walked away at the 1:26:08 time mark, and her friends separate T.H. from her at 1:26:14.

28. One of A.M.'s friends can be seen confronting T.H., yelling at him, for what he said, immediately after A.M. and T.H. were separated.

29. A.M. was surrounded by friends, including the friend who confronted T.H., at the 1:26:40 time mark, clearly distraught. She covers her face with her hands, concealing her emotional state, at the 1:27:48 time mark. A.M., trying to recount what happened, pointed at T.H., at the 1:28:56 time mark, and is still being comforted by friends at the 1:29:00 time mark.

30. T.H. remained around the wall of the gym near a basketball goal with his friends until 1:30:00, and then leaves the camera view.

31. At the 1:30:30 time mark, A.M., with a friend, runs off camera to find an adult.

6

32. At 1:31:41, an adult in a pink shirt (presumably Mr. Yager, appears on camera), presumably to attempt to find T.H.

33. Mr. Yager asked A.M. where T.H. was, and she told him she did not know.

34. Mr. Yager then radioed the School Resource Officer Tim Givden about T.H.

35. At this point on January 30, 2025, two appropriate persons at the school and the school itself, had actual knowledge about the sexual harassment, threatened assault, and rape threat.

36. A.M. stayed there when Mr. Yager walked away.

37. A.M. was alone, terrified, and traumatized by T.H.'s sexual harassment, threatened sexual assault, and threatened rape, so she did the only thing she knew to do to seek protection: call her mother.

38. At 4:27 p.m. on or about January 30, 2025, A.M. called Sherry.  A.M. was in distress, and Sherry could not make out what A.M. was saying. Sherry could only tell A.M. was sobbing.

39. Sherry rushed to drive to the school to pick up her daughter at approximately 4:30 p.m. Upon arriving, Sherry could see A.M. was still sobbing, was terrified, and was completely unaccompanied by school staff.

40. When Sherry arrived, Carroll County Middle School Assistant Vice Principle Will Yager and Student Resource Officer Tim Givden were outside. No one made any contact with Sherry to explain the situation and no adults were with A.M.

41. Both Vice Principle Yager and Officer Givden were appropriate persons to report sexual harassment, as both of them have authority to take corrective action to end discrimination or harassment.

42. Sherry took A.M. home and again tried to get her to tell her what happened. All A.M. was able to say was "he said he was going to rape me."

7

43. Sherry immediately called local dispatch at 5:04 p.m. on or about January 30, 2025, to ask for an officer to come to their home.

44. Officer Darrius Taylor with the City of Carrolton, arrived at Plaintiffs' home and questioned A.M. on the events of the evening.

45. A.M. reported the events herein to Officer Taylor.

46. After Sherry called dispatch on or about January 30, 2025, Sherry emailed Robin Stephenson ("Stephenson"), the principal of CCMS, another appropriate person at the school who has authority to take corrective action to end discrimination or harassment against A.M., and Sherry told Stephenson what happened to A.M.

47. Stephenson then called Sherry back, whose husband answered because Sherry was still with A.M. and the police officer. Stephenson informed Sherry's husband that she hadn't heard anything from anyone other than Sherry, she was calling because she had received Sherry's email.

48. Officer Taylor, that same night, went to T.H.'s house and questioned him on the situation.

49. The police report from this incident reflects that, upon questioning, T.H. admitted that he sexually harassed, and threatened to rape A.M.

50. On or about January 31, 2025, Sherry kept A.M. home from school because A.M. was still traumatized from the January 30 incident and was scared T.H. would follow through with his threats if she encountered her at school, and Sherry notified Mrs. Stephenson.

51. Stephenson said she understood Sherry's reasoning, acknowledging the threatened sexual assault on A.M., ongoing harassment, and the need for space between A.M. and T.H, and for the school to intervene.

8

52. In the afternoon of January 31, 2025, Sherry took A.M. to Nick Marsh's office, who works for the Carroll County Middle School administration, to file a formal complaint with the school. This complaint was filed by Sherry with Defendants.

53. Plaintiffs filed the complaint with Mr. Marsh's receptionist, further demonstrating that the Board had actual knowledge of the ongoing sexual harassment, assault, and rape threat.

54. On or about February 3rd, 2025, Sherry took A.M. to the school so that she could physically show Mrs. Stephenson and Mr. Yager where she was when the incident occurred.

55. Sherry recorded the entire interaction.

56. Defendant Stephenson informed Sherry that they had watched the video, and purportedly never saw the interaction between A.M. and Thomas. Sherry told Stephenson that A.M. was not lying.

57. In response to Sherry's inquiry, the Defendants never permitted Sherry to view the video, despite initially saying Sherry would be permitted to see the video – but Defendants later retracted that promise, telling Sherry she would need to subpoena them in order to see the video – and upon information and belief, that is because the video did depict the interaction and Defendants have undertaken to cover the incident up.

58. In fact, the video does depict *exactly* what A.M. claimed happened.

59. Defendants' video of the dance depicts, at the 1:25:30 time mark, T.H. approaches the area where A.M. and her friends are, between the bleachers and the wall of the gym, who proceeds to watch A.M. from the bleachers.

60. At around the 1:25:57 time mark, T.H. approaches the group, and can be seen talking to A.M. At this point, T.H. can be seen tugging at his shirt, as if he is attempting to undo his shirt.

61. What T.H. said was so severe, A.M. walked away at the 1:26:08 time mark, and her friends separate T.H. from her at 1:26:14.

62. One of A.M.'s friends can be seen confronting T.H., yelling at him, for what he said, immediately after A.M. and T.H. were separated.

63. A.M. was surrounded by friends, including the friend who confronted T.H., at the 1:26:40 time mark, clearly distraught.  She covers her face with her hands, concealing her emotional state, at the 1:27:48 time mark.  A.M., trying to recount what happened, pointed at T.H., at the 1:28:56 time mark, and is still being comforted by friends at the 1:29:00 time mark.

64. T.H. remained around the wall of the gym near a basketball goal with his friends until 1:30:00, and then leaves the camera view.

65. At the 1:30:30 time mark, A.M., with a friend, runs off camera to find an adult.

66. At 1:31:41, an adult in a pink shirt (presumably Mr. Yager, appears on camera), presumably to attempt to find T.H.

67. On or about February 3, 2025, Sherry then met with Defendant Stephenson, Mr. Yager, and A.M. to discuss the situation, and the school's plan of action to address what happened to A.M.

68. Sherry also questioned Defendant Stephenson and Mr. Yager, criticizing the school system, on why it was not handled better by the adults in charge when the incident occurred.

69. Sherry wanted to know why she was not immediately called and why the parents of the boy had not been called either. In response, Sherry was never given a straight answer.

70. Sherry then asked if T.H. could be moved out of A.M.'s two classes until this could be investigated. Sherry was promised that would happen.

71. Sherry then left A.M. with instructions to call her if she needed anything.

72. Instead of moving T.H., Defendant Stephenson, as well as John and Jane Doe Defendants 1-5, in retaliation for Sherry's criticism, complaints, and inquiries, as well as A.M.'s reports of ongoing sexual harassment, sexual assault threats, and criticisms punished A.M. by telling her to go to the office before her 3rd and 6th period classes, doing so without giving A.M. any opportunity to receive instructional material.

73. On or about February 3, 2025, A.M. called Sherry from school. A.M. informed Sherry that she had been in the office for a while and didn't know what she was supposed to do. Sherry told A.M. to ask an adult.

74. A.M. – having been sent to the office instead of receiving the education to which she was entitled,  all because she was a ten-year-old victim of sexual harassment and rape threats and her mother insisted that the school protect A.M. – said she did not know who to talk to and she was scared to ask, so Sherry went back to the school.

75. Upon arriving, Sherry found A.M. sitting unsupervised in the front of the office. Sherry asked her what was going on. A.M. said she went to the office like she was told and there was no one there giving her instruction so she just sat and waited, missing class with no ability to complete classwork.

76. Sherry then found Defendant Stephenson and asked why A.M. had been forced to miss nearly two whole classes.

77. Stephenson told Sherry that it had been miscommunication, but in reality it was Defendant Stephenson retaliating against Sherry and A.M. for their protected speech that included the complaints.

78. A.M. was then told to go to class, but to return to the office before her 6th period (a class she shared with T.H.), so that T.H. could be moved so A.M. could attend class.

79. Mrs. Stephenson assured Sherry that A.M. being made to sit in the office for another period and a half would not happen again, that it would be "taken care of."

80. Sherry again told A.M. if she needed anything, to call her.

81. A.M. was sent to all of her remaining classes on February 3, 2025, and Defendants took no measures to remove T.H. from A.M.'s 6th period class.  Upon information and belief, Defendants kept T.H. in the classroom with A.M. in retaliation for Plaintiffs' protected speech and conduct, knowing that T.H.'s presence would traumatize A.M. and cause further emotional distress in A.M., T.H.'s ten-year-old victim.

82. When A.M. went to her 6th period class, T.H. was still in her class.

83. Being confronted by the classmate who threatened sexual assault on A.M. caused immediate and severe emotional distress, taking A.M. back to the memory of T.H. attempting to sexually assault her.

84. Defendants refused to remove T.H. from the class she shared with A.M.

85. A.M. then called Sherry to communicate what had happened.

86. Due to the Defendants' refusal to remove T.H. from A.M.'s classes, T.H. witnessed A.M. having a severe and immediate emotional response to his presence.

87. In response to the Defendants' inaction, T.H. and his friends then expanded their sexual harassment campaign against A.M.  Included in this harassment campaign was the use of a group chat in which T.H. and other students would talk about "raping and fucking" A.M. and other 5th grade girls, the creation of a SnapChat profile to imitate and harass A.M., and otherwise engage in harassing communications, including from and on school property and during school hours, that was so severe, pervasive, and objectively offensive that it denied A.M. access to the educational opportunities and benefits afforded by the Board.

88. The group chat was titled "Diddy Party," referencing Sean "Diddy" Combs, who – at the time – was facing several charges related to sexual misconduct, including prostitution, human trafficking, and other allegations of nonconsensual sexual conduct.  Mr. Combs was convicted of the prostitution charges.

89. The Defendants were aware of this egregiously titled group chat, but refused to act and fostered a culture in Carroll County Schools that encouraged students as young as 10 years old to engage in Diddy-esque conduct.

90. The SnapChat imitating A.M., upon information and belief, was created by another student, L.G., who is friends with T.H.  The user of the SnapChat has identified herself as L.G.

91. Sherry returned to the school on or about February 3, 2025, and asked to speak to Stephenson again. This time, Sherry was taken into Stephenson's office along with Kendal Yager, another staff member at the school.

92. Sherry asked Defendant Stephenson why A.M. was not only sat in the office that day to fall behind on work, but again, why was she put into a class with T.H. after Sherry was told he would be moved pending investigation.

93. Defendant Stephenson, angered by Sherry's insistence that A.M. be protected by Defendants from the classmate who sexually harassed and threatened to rape her, then asked Sherry in a disdainful and snide manner, "what do you want me to do?"  Stunned, Sherry told her "I want you to protect my daughter, that simple."

94. Stephenson then proceeded to ask Sherry if she wanted A.M. to be moved.

95. Sherry, upset by the insinuation that her daughter's routine was likely to be further disrupted because of T.H.'s misconduct and the school's deliberate indifference to A.M.'s wellbeing and

ongoing harassment directed towards A.M., told her "Absolutely not! A.M. has done nothing wrong! Why should she have to be moved?!"

96. Stephenson then looked to Kendal Yager and asked her, "is that possible? How do the numbers look?"   Yager responded "Absolutely! He can be moved with zero issues"

97. Stephenson returned to her laptop and said "done, he's moved. And I'll send an email to the entire 5th grade team, letting them know the situation and why" then Kendal stated, "I will meet [T.H.] off the bus in the morning and let him know about the change that way this doesn't happen again"

98. At this point, upon information and belief, Defendants – particularly Defendant Stephenson and Jaynes – launched a social media surveillance campaign against Sherry to monitor what Sherry was saying about the treatment of her daughter by the school.

99. Defendant Jaynes was motivated to monitor and retaliate against Sherry in an effort to conceal the sexual harassment and threatened rape of A.M. – and the coverup campaign of the School system – because, at the time, Defendant Jaynes was pushing for a property tax increase to bring more funds to the Carroll County School system, and prioritized passing that tax increase over the safety and wellbeing of the students Defendants are tasked with protecting.

100.    At 9:01 on or about February 4, 2025, A.M. called Sherry in tears from the bathroom. She told Sherry "Mommy, [T.H.] is still in my class."

101.    Despite promising to do so and purporting to do, Defendants in fact refused to remove T.H. from the class he shared with A.M.  This unreasonable response caused an immediate, severe emotional response from A.M., rendering her unable to access the educational opportunities and benefits provided by the school.

102.    Sherry told A.M. to go to the office and wait for her.

14

103.   A.M., a ten-year-old girl who had just been threatened with rape and sexual assault, and whose school has fundamentally failed to take any action to protect her from the person who made such threats, was afraid to because she was scared to go to the hallway, lest she face further harassment.

104.   A.M. eventually went to the office where her father and Sherry met her.

105.   Sherry's husband, on or about February 4, 2025, initiated a conversation with DC Craig, the acting vice principal at CCMS.

106.   Sherry's husband asked Mr. Craig "why do you keep putting my daughter in a class with a boy who threatened to sexually assault her?"

107.   Mr. Craig then told my husband, "Let me get you someone who's actually involved in this."

108.   Sherry's husband then asked him "what do you mean someone who's involved? You're the vice principal and you were there?"

109.   Mr. Craig is an appropriate person who has the authority to take corrective action to take corrective action to stop the discrimination and harassment at Carroll County schools, but he took no action on behalf of the Board.

110.   Due to the Board's refusal to take action, T.H. and his friends then expanded their sexual harassment campaign against A.M.  Included in this harassment campaign was the use of a "Diddy Party" group chat in which T.H. and other students would talk about "raping and fucking" A.M. and other 5th grade girls, the creation of a SnapChat profile to imitate and harass A.M., and otherwise engage in harassing communications, including from and on school property and during school hours, that was so severe, pervasive, and objectively offensive that it denied A.M. access to the educational opportunities and benefits afforded by the Board.

111.   The SnapChat, upon information and belief, was created by another student, L.G., who is friends with T.H.  The user of the SnapChat has identified herself as L.G.

112.   A.M. and Sherry made additional complaints about this ongoing harassment and the harassment campaign, but that also was met with inaction.

113.   After Sherry left the school with A.M., she went to the Board to speak with Mark Wilhoite, who works directly under Defendant Jaynes, on or about February 4, 2025.

114.   Sherry explained the whole situation to Wilhoite.  Wilhoite appeared stunned by the retaliatory actions of the school and Defendant Stephenson against Plaintiffs (and inaction against T.H. and the other students harassing A.M.).

115.   Wilhoite said "I don't understand this. If you were told he'd be moved, I don't understand why he hasn't been."  Wilhoite then said he was going to call Robin Stephenson and ask her what had happened to her plan. Robin Stephenson did call Wilhoite.

116.   Wilhoite, acknowledging the Board's deliberate indifference to the sexual harassment of ten-year-old A.M., told Sherry "I guess the 5th grade team didn't take this seriously. I will talk to them again."

117.   Sherry told Wilhoite that she will most likely keep A.M. from school the remainder of the week to protect her daughter since no one else will.

118.   Wilhoite told Sherry that he absolutely understood and that if he was in her shoes, he would do the same thing.  Mr. Wilhoite told Plaintiffs that they were doing everything right.

119.   Shery asked if there was anything else they could do.

120.   Mr. Wilhoite said not that he knew of, they were doing what they could.

121.   Sherry asked to see the video of the incident.

122.    Mr. Wilhoite told Sherry they could view the video initially, but that it would take a few days to blur out the faces of all of the minors.  However, when Sherry called back a few days later, on or about February 8, 2025, asking if she could now see the video, she was told she needed a subpoena.

123.    Mrs. Stephenson falsely informed Sherry that they never saw A.M. and T.H. on video.  She also falsely said multiple students had been interviewed and nothing could be found.

124.    But again, the video *clearly* depicts *exactly* what A.M. claims happened.

125.    Defendants' video of the dance depicts, at the 1:25:30 time mark, T.H. approaches the area where A.M. and her friends are, between the bleachers and the wall of the gym, who proceeds to watch A.M. from the bleachers.

126.    At around the 1:25:57 time mark, T.H. approaches the group, and can be seen talking to A.M.  At this point, T.H. can be seen tugging at his shirt, as if he is attempting to undo his shirt.

127.    What T.H. said was so severe, A.M. walked away at the 1:26:08 time mark, and her friends separate T.H. from her at 1:26:14.

128.    One of A.M.'s friends can be seen confronting T.H., yelling at him, for what he said, immediately after A.M. and T.H. were separated.

129.    A.M. was surrounded by friends, including the friend who confronted T.H., at the 1:26:40 time mark, clearly distraught.  She covers her face with her hands, concealing her emotional state, at the 1:27:48 time mark.  A.M., trying to recount what happened, pointed at T.H., at the 1:28:56 time mark, and is still being comforted by friends at the 1:29:00 time mark.

130.    T.H. remained around the wall of the gym near a basketball goal with his friends until 1:30:00, and then leaves the camera view.

17

131.    At the 1:30:30 time mark, A.M., with a friend, runs off camera to find an adult.

132.    At 1:31:41, an adult in a pink shirt (presumably Mr. Yager, appears on camera), presumably to attempt to find T.H.

133.    While A.M. was out of the classroom, Sherry tried multiple times to get schoolwork for A.M.

134.    In retaliation for Sherry's inquiry into the sexual harassment and threatened sexual assault of her daughter and attempts to keep her daughter safe, and Sherry's criticism of how the Board Defendant had handled the sexual harassment and threatened assault and assault and attempted rape of A.M., Defendant Stephenson, and John and Jane Doe Defendants 1-5 stonewalled any effort to get schoolwork to A.M., intentionally disrupting her access to educational resources for several days.

135.    Sherry asked for a Chromebook for A.M. to bring home, and Defendant Stephenson, John and Jane Doe Defendants 1-5, in further retaliation for Sherry's inquiry into the handling of the threatened sexual assault of her daughter and for her criticism of the school system's handling of the situation, did not allow A.M. to obtain her Chromebook for multiple days - further interrupting A.M.'s education.

136.    Sherry then met with Mrs. Sheila Reynold (who may be a Jane Doe Defendant) at the school to ask her for work, she said she would get back with Sherry at the end of the day, and she did not.

137.    Eventually T.H. was moved out of A.M.'s classes on approximately February 14, 2025.

138.    T.H. admitted to there being a group chat called "Diddy Party", discussing "raping and fucking" 5th grade girls, including A.M., and efforts in coordinating ongoing harassment

towards A.M.  At this point, the Defendants were aware of, and acquiesced to, the existence of a group chat promulgating a culture of sexual harassment in the school system.

139.    L.G., a friend of T.H., has admitted to operating a SnapChat at the behest of T.H. to imitate and harass ten-year-old A.M.

140.    No action has been taken against T.H., L.G., or any of the participants in the "Diddy Party" group chat by the Board or other Defendants.

141.    Sherry attempted to approach the Board on or about February 18, 2025 to file a Title IX Complaint in light of the foregoing information.

142.    On or about February 11, 2025, the Defendant School System began exhibiting hostility toward Sherry for her asserting the rights of her daughter and her speech, in response to Sherry contacting the Carroll County Attorney about the incident A.M. experienced.

143.    On February 11, 2025, Defendant Jaynes, the head Decisionmaker of the *Monell* Defendant, affirmed the failure to investigate and adequately address the harassment faced by A.M., saying to Defendant Stephenson in response to the County Attorney contacting the school system: "I hope that this provides some justification for your team....  You all went above and beyond for this parent and I know you do for all parents....  Thanks, Casey."

144.    On February 14, 2025, the School System, in an effort to retaliate against Sherry and A.M., attempted to compel A.M. to sit in a work room for school work she has completed.

145.    In response, Sherry emailed Denise Smith: "A.M. returned ALL of her NTI into Mrs Duncan. She will not sit in a work room for work she's already done.

146.    The school system doubled down, in which Denise Smith emailed Assistant Principal Mr. Yager: "Just so you know, after this rude message back I won't be contacting this mom

anymore. She has not turned in NTI 7 and 8 to me yet. I was just trying to give a friendly update."

147.    For the avoidance of all doubt, A.M. turned in all NTI work, including all work she missed while she was out of the classroom in response to T.H.'s severe, pervasive, and objectively offensive harassment campaign against her, and the Defendants' failure to properly address the harassment she faced.

148.    On February 18, 2025, Defendant Stephenson emailed Defendant Jaynes with a screenshot in which Sherry said on Facebook, "#rapecultureisreal #sexualharassment #NeverOk #dobetter #Disgusting," with a search result regarding sexual harassment.

149.    To be clear, criticizing Defendants with the statement that "Rape Culture" is real is entirely protected by the First Amendment.

150.    On February 18, 2025, Sherry filed a formal Title IX Complaint with the Board, and against CCMS and Stephenson, as well as the Board, and other officials, for their failure to intervene, address the sexual harassment and threatened rape, and prevent further sexual harassment and threatened assault, assault, and rape threats against A.M.

151.    On February 24, 2025, Defendant Stephenson, again, sent a screenshot to Defendant Jaynes, depicting Sherry posting about her deciding to file the Title IX complaint against Defendant Carroll County Schools, for their failure to address the sexual harassment A.M. faced that Defendants failed to address.

152.    In response, Defendant Jaynes, on February 27, 2025, in an effort to silence Sherry about her truthful statements of Defendants' deliberate indifference towards threatened rape of a minor student that Defendants whitewashed, and the potential PR nightmare that could interfere with his personal agenda, emailed Mark Willhoite and Jenna Stevens, "Please try to

20

get Mrs. McLaughlin in here for a summary meeting tomorrow. She continues to spread misinformation about this situation."

153. On March 2, 2025, Defendant Stephenson, pursuant to the surveillance campaign, sent a screenshot of a Facebook post in which Sherry again criticized Defendants by saying "Sexual misconduct. Sexual harassment. Instead of worrying about hoodies and long nails, why don't we focus on the mental health of BOTH victims AND aggressors. No child should ever feel threatened. No child should be able to grasp the concept of sexual assault. Do better."

154. For the avoidance of all doubt, Sherry's commentary is protected speech, but infuriated Defendants because it highlighted the acquiescence and deliberate indifference by Defendants to the culture of sexual harassment at Carroll County Schools.

155. In the morning of March 3, 2025, Defendant Stephenson sent another screenshot of a post from Sherry criticizing Defendants that said "You WIL NOT push my child away. You WILL be held accountable for your LACK of concern. #IfItWasYourChildItWouldBeDifferent" with a graphic addressing student reactions to sexual harassment, which Ms. Stephenson said was "Rather threatening in nature today."

156. To be clear, Sherry's speech is protected under the First Amendment, was not threatening, and was a criticism of the school's failure to address the sexual harassment of her daughter, A.M.

157. Defendant Jaynes responded, "Jenna sent her letter today about receiving the complaint. We have to now mail both her and the parent of the accused of our findings," indicating his intent to retaliate against Sherry for her criticism of Carroll County Schools.

158. On the evening of March 3, 2025, Sherry went to CCHS to pick A.M. up from cheer practice.

159. The pickup went without flaw. As soon as Sherry walked in, the cheer staff had A.M. in a one-man stunt, and coaches yelled for Sherry to record her, which she did.

160. Sherry was proud of her daughter, and the staff was happy Sherry got to witness this. There was no confrontation, and Sherry took A.M. home when practice ended without incident.

161. Defendant McIntyre, conspiring with Defendants, emailed Mark Willhoite, Timothy Gividen, and Defendant Stephenson, defaming Sherry by claiming that as she was walking down the steps out the doors of cheer practice, that Sherry allegedly loudly stated "you're nothing but a rude twat." The report never claimed any threats, incitement, or any unprotected conduct on Sherry's part.

162. For the avoidance of all doubt, Sherry never called Defendant McIntyre, or anyone at Carroll County Schools, "a rude twat," nor did she even use such a term on school property.

163. But even *if* Sherry did make such a statement, it is protected under the First Amendment.

164. On Tuesday, March 4, 2025, Sherry received an email from Defendant Casey Jaynes, Superintendent of Carroll County Schools, falsely, baselessly, and maliciously stating that Sherry had been accused of threatening a Carroll County staff member on March 3, and banning her from school grounds (and not just CCMS). To be clear, this ban prohibits Sherry from: (i) attending or viewing any extracurricular functions; (ii) going to school to address further and ongoing harassment of A.M.; or (iii) for any other purpose other than dropping off or picking up her children, in which case she cannot exit her vehicle.

165. Defendant Jaynes sent this email and took the action banning Sherry from school grounds, not for any legitimate reason, but instead in retaliation against Sherry's filing of a Title IX complaint against the school, as well as Sherry's ongoing criticism of Defendants, including on social media, and A.M.'s other protected activities relating to reporting the sexual

22

harassment and threatened rape of A.M. as well as other activities directed towards A.M. by T.H. and others, and school officials' indifference towards these complaints and criticisms.

166.    Defendant Jaynes used the false incident between Sherry and Defendant McIntyre as a pretextual justification to trespass Sherry, as his intent to retaliate against Sherry was made clear in his email and other communications, which was sent **before the alleged incident** responding to Defendant Stephenson's screenshot of Sherry criticizing the school for not properly addressing the sexual harassment and threatened rape of her daughter.

167.    Defendant Jaynes further forwarded this letter to the chief of police, all SRO's employed at Carroll County Schools, and the County Attorney in an effort to provoke further retaliation.

168.    Defendant Jaynes had previously met Sherry through her involvement with her child's extracurricular activities, indicating he knew how severe this punishment was for Sherry inquiring into the handling of her daughter's threatened sexual assault, criticizing the school's lack of handling the matter in a way that would protect A.M., and for filing a Title IX complaint as well as her other protected activities relating to reporting the sexual harassment and threatened rape of A.M. as well as other activities directed towards A.M. by T.H., L.G., and others, and school officials indifference towards these complaints and criticisms.

169.    Sherry emailed Defendant Jaynes back immediately and told him she had no idea what he was talking about, that she had multiple witnesses willing to testify to that she never threatened anyone, and asked him if she could please speak to him to defend herself against these accusations.

170.    Defendant Jaynes, in further retaliation, and knowing he had lodged false and malicious allegations to retaliate for protected First Amendment speech activities, immediately emailed

Sherry back and said "there is no appeal process for this action," doubling down on his illegal retaliation against Sherry.

171.    In an attempt to undo the ban, Sherry immediately reached out to the Office of Educational Accessibility (OEA) and the school board to file complaints to rectify the situation.

172.    Sherry spoke to Brad Nelson at the OEA. Nelson called Defendant Jaynes himself to try and resolve the issue, since Jaynes refused to answer Sherry's emails.

173.    Realizing that there was no legitimate basis for the ban, Defendant Jaynes, rather than addressing the allegations, said the ability to ban Sherry was solely at Defendant Jaynes' discretion.

174.    One of the Board members revealed that Defendant Brandy McIntyre, one of the middle school counselors and family members of Defendant Stephenson, had called Defendant Casey Jaynes and conspired with Jaynes and Stephenson to ban Sherry because of her efforts to ensure the school protected ten-year-old A.M. from further sexual harassment and rape threats that will leave A.M. traumatized for life, on the knowingly false basis of a purported threat, and knowing that allegation to be false.

175.    Defendant McIntyre did this in retaliation against Sherry filing a Title IX complaint against the school, inquiring into the handling of the sexual harassment and threatened sexual assault of A.M., and for criticizing the school's handling of the sexual harassment and threatened sexual assault of A.M.

176.    At no point did Defendant ever threaten Defendant McIntyre, or anyone for that matter.  In fact, Sherry has no recollection of even talking with Defendant McIntyre on March 3, 2025.

177.    On March 5, 2025, a mere day after Defendant Jaynes banned Sherry from school grounds in retaliation for her protected speech, the Defendant Board, through Defendant Jenna Stevens

- the Title IX Coordinator of Carroll County Schools - sent a letter to Sherry, dismissing her Title IX complaint against the school. Sherry has fully exhausted all processes available to her with respect to the Board and Carroll Schools processes under Title IX.

178. In the March 5, 2025 letter, Defendant Stevens and the Board, and knowing that this determination was false, wrote that the sexual harassment and threatened assault, attempted rape, and ongoing sexual harassment and threatened assault and bullying campaign of A.M. "does not meet the definition of sexual harassment as outlined in the Title IX regulations and the district's Title IX Sexual harassment Policy."

179. Since March 4, 2025, Sherry has been unable to attend any practices or scrimmages or any other school events on Carroll County School grounds, for any of her children.

180. Until Defendant Jaynes and the Board banned Sherry from school grounds on March 4, 2025, Sherry was heavily involved in her children's extracurricular activities, volunteering for school functions, and being a heavily involved parent.

181. Defendant Jaynes reaction to all of this, including banning Sherry, was to mock her and the situation, including in written emails, demonstrating his malice towards her.

182. The March 4 ban has also led to two incidents in which A.M. was in need of her medications, and Sherry was not able to bring them to her at the school, jeopardizing not only A.M.'s already fragile mental health due to T.H.'s sexual harassment, rape threats, and ongoing sexual harassment and bullying campaign against ten-year-old A.M. – which was prompted by the school's deliberate indifference to T.H.'s initial sexual misconduct – through a "Diddy Party" group chat in which he and others brag about "raping and fucking" A.M. and others and through a SnapChat started by L.G. at the behest of T.H. to imitate and harass A.M., but also

jeopardizing A.M.'s physical health all in pursuit of Defendants' retaliation campaign against Plaintiffs.

183.    The March 4, 2025 ban has separated Sherry from her family and from her ability to be involved in her children's extracurricular activities, all because she refused to allow her daughter to be punished for being the victim of sexual harassment, threatened sexual assault, and threatened rape.

184.    The March 4, 2025 ban has caused significant damages to Sherry, including emotional distress – resulting in her not being able to hold food down, suffering physical symptoms including nausea, an inability to hold down food, vomiting and weight loss; and now seeing a therapist – reputational harm, and other damages.

185.    The March 4, 2025 ban has also caused significant damages to A.M. that will impact her for the rest of her life. A.M.  is currently in therapy due to this situation. A.M. has lost weight, friends, and her self-confidence, cannot sleep, and lives in fear knowing she cannot depend on her mother when she's in school, because Sherry am unable to go to her, and further cannot depend on the school who failed to intervene and protect her when she was sexually assaulted, but even punished her because her mother spoke out and demanded A.M. be protected by her school.

186.    The harassment and bullying campaign against A.M. continues to this day.  In fact, on or about April 16, 2025, T.H. has expanded his harassment of A.M. by attempting to make contact with her on SnapChat through his own profile, knowing A.M. does not want to be around him after he sexually harassed, launched a bullying campaign, threatened sexual assault, and threatened rape against A.M.

187.    Defendants have still taken no action to end the sexual harassment campaign that was launched against a ten-year-old girl, and inspired by the school's deliberate indifference to A.M.'s rights.  Defendants have fostered an environment that accepts and encourages sexual misconduct against children like ten-year-old A.M., leaving A.M. traumatized for what happened to her from January 30, 2025, and onward, which will follow A.M. for the rest of her life.  Rather than accept their duty as a school system and put an end to the misery inflicted upon A.M., Defendants have made the situation worse by punishing Plaintiffs for simply calling out for help when they need it the most.

188.    Even after the ban, the surveillance campaign continues in which Defendants monitor Sherry's online behavior, including efforts to have Sherry prosecuted for merely posting images of her children participating on school property, even though Sherry has complied with Defendants' illegal, retaliatory trespass order.

### *Monell Liability against Carroll County Schools*

189.    Plaintiffs reincorporate the preceding paragraphs as if fully set forth herein.

190.    The Board is liable for the violations herein, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), including, without limitation, because (i) First Amendment retaliation and violations of Equal Protection, is the official policy of the Board, evidenced by Jaynes having final decision-making authority under Kentucky law and Board policy, with respect to respect to the March 4, 2025 ban and other retaliatory actions complained of, and Jaynes as that top decision-maker approved of, directed, and personally participated in the actions complained of to include the ban from school, and (ii) the Board had and still has a custom of tolerance or acquiescence of federal rights violations including those herein; and

(iii) despite a pattern and practice of similar violations, the Board has failed to train to prevent such violations, leading to the violations complained of herein.

### CLAIM I – FIRST AMENDMENT RETALIATION, CONSPIRACY TO ENGAGE IN FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983 against Defendants Jaynes, McIntyre, Stevens, and Stephenson in their individual capacity, and against Carroll County Schools under *Monell*)

191.    Plaintiffs reincorporate the preceding paragraphs as if fully set forth herein.

192.    Plaintiffs are citizens of the United States of America.

193.    Plaintiffs also have clearly established rights and protections under the First and Fourteenth Amendments to the United States Constitution.

194.    Defendants, using their offices and acting under color of state law, violated and are violating Plaintiffs' First and Fourteenth Amendment Rights.  Defendants Jaynes, McIntyre, Stevens, and Stephenson in their individual capacities thereby subjected themselves under 42 U.S.C. § 1983, to be liable for monetary damages sought herein.

195.    Defendants, using their offices and acting under color of state law, violated and are violating Plaintiffs' First and Fourteenth Amendment Rights, which have deprived, are depriving, and will deprive Plaintiffs of their rights to equal protection and of speech, petitioning the government for redress, which rights are clearly established.

196.    Defendants abused the authority of their offices and, while acting under color of law and with knowledge of Plaintiff's clearly established rights, used their offices to violate Plaintiffs' First and Fourteenth Amendment rights.

197.    Plaintiffs engaged in protected speech and conduct, namely reporting harassment, and threatened sexual assault, inquiring into the handling of ten-year-old A.M.'s threatened sexual assault and harassment, criticizing school officials for not adequately handling the

investigation into A.M.'s threatened sexual assault by refusing to remove T.H. from A.M.'s classes, and filing a Title IX complaint against the school for such inadequate handling.

198.    Criticizing public officials is plainly and clearly established as protected activity. *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018); *Connick v. Myers*, 461 U.S. 138, 148 (1983) (Speech that "bring[s] to light actual or potential wrongdoing or breach of public trust" is speech that addresses a matter of public concern, as is speech that "seek[s] to inform the public that [the government] [is] not discharging its governmental responsibilities."); *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010). So is petitioning government officials for redress. *Nailon v. Univ. of Cincinnati*, 715 Fed. Appx. 509, 514 (6th Cir. 2017), *quoting Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008).

199.    The cases of *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509 (6th Cir. 2017), *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534 (6th Cir. 2003), *Ward v. Athens City Bd. of Educ.*, 187 F.3d 639 (6th Cir. Aug. 11, 1999) clearly establish that a plaintiff may bring a First Amendment retaliation claim where retaliation has occurred due to a relative's protected speech. *See, also, Fakhoury v. O'Reilly*, 837 Fed. Appx. 333 (6th Cir. 2020). *Nailon* made the point that this law was clearly established by 2017 (actually as of 1999), well before the actions of Defendants here. In any event, *Heffernan v. City of Paterson*, 578 U.S. 266 (2016) makes clear that retaliation for protected speech is prohibited regardless of who is doing the speaking.

200.    Defendants took adverse actions against A.M., including revoking her access to the classroom, refusing to furnish schoolwork to her, and putting her in a classroom with T.H. while knowing that she was traumatized by his presence after he sexually harassed her, threatened to sexually assault and rape her, all in retaliation for the foregoing protected speech.

201. Defendants took adverse action against Sherry, by banning her from school grounds, including extracurricular activities of her children, all in retaliation for the foregoing protected speech.

202. An adverse action need not be significant to be actionable. *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999) (*en banc*). An adverse action is "one that is 'capable of deterring a person of ordinary firmness' from exercising the constitutional right in question." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010).

203. The actions taken by Defendants herein are sufficiently adverse to be capable of deterring a person of ordinary firmness from exercising their constitutional rights. In fact, it is clearly established law that banning a parent from a student's extracurricular activities due to First Amendment protected activity is sufficient to satisfy they elements of First Amendment Retaliation. *McElhaney v. Williams*, 81 F.4th 550 (6th Cir. 2023).

204. Finally, there was a causal connection between the protected speech and the adverse action, both because the adverse actions were actually caused because of the protected First Amendment activities, and the adverse action was motivated at least in part by the plaintiffs' protected conduct, namely, Defendant Jaynes banned Sherry a mere 14 days after she filed the Title IX complaint, and just a few days after she voiced concerns about the handling of the issue and complaints, and the punishment of A.M. began immediately after the sexual harassment and threatened sexual assault and rape, was reported to Defendants.

205. Therefore, (1) the plaintiffs engaged in protected conduct as set forth in the paragraphs above including as outlined in the factual section, which is reincorporated by reference; (2) adverse actions were taken against Sherry and A.M. that would deter a person of ordinary firmness from continuing to engage in that conduct as set forth in the paragraphs above

including as outlined in the factual section, which is reincorporated by reference; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiffs' protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

206.    Defendants Jaynes, McIntyre, Stevens, and Stephenson also conspired with each other to violate Sherry's First Amendment rights, as demonstrated by their communications. *Rudd*, 977 F.3d 503, 512-513; *Beck v. Prupis*, 529 U.S. 494, 502-03 (2000). Specifically, Defendants Jaynes, McIntyre, Stevens, and Stephenson had a single plan: to retaliate against Plaintiff for her protected activities; Defendants Jaynes, McIntyre, Stevens, and Stephenson each shared in this general conspiratorial objective; and an overt act was committed in furtherance of the conspiracy, namely the ban from school and ginning up a pretextual basis for that ban. They are thus all jointly and severally liable under a conspiracy theory.

207.    The foregoing violations of the First Amendment proximately and actually caused Sherry and A.M. damages, to include pecuniary damages resulting from A.M. and Sherry needing to see a therapist, loss of educational opportunities, and other damages to include humiliation and emotional distress, exceeding $50,000 in an amount to be proven at trial.

208.    The Board is liable for such damages under *Monell*, including for the reasons set forth in Paragraph 190.

209.    Jaynes, McIntyre, Stevens, and Stephenson, as well as John and Jane Doe Defendants 1-5 are individually liable for punitive damages, in an amount to be proven at trial, because their actions were motivated by evil motive or intent, and because their actions involved reckless or callous indifference to the federally protected rights of Plaintiffs. In fact, punitive damages

are always appropriately submitted to a jury in First Amendment retaliation cases. *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015).

210.    Defendants are all liable for attorney fees and costs pursuant to 42 U.S.C. § 1988.

## CLAIM II – Equal Protection including for Student-on-Student Sexual Harassment  (42 U.S.C. § 1983 against Defendants Jaynes, McIntyre, Stevens, and Stephenson in their individual capacity, and against Carroll County Schools under *Monell*)

211.    Plaintiffs reincorporate the preceding paragraphs as if fully set forth herein.

212.    Plaintiffs are citizens of the United States of America.

213.    Plaintiffs also have clearly established rights and protections under the First and Fourteenth Amendments to the United States Constitution.

214.    Defendants, using their offices and acting under color of state law, violated and are violating Plaintiffs' Fourteenth Amendment Rights.  Defendants Jaynes, McIntyre, Stevens, and Stephenson in their individual capacities thereby subjected themselves under 42 U.S.C. § 1983, to be liable for monetary damages sought herein.

215.    Defendants, using their offices and acting under color of state law, violated and are violating Plaintiffs' Fourteenth Amendment Rights, which have deprived, are depriving, and will deprive Plaintiffs of their rights to equal protection, which rights are clearly established.

216.    Defendants abused the authority of their offices and, while acting under color of law and with knowledge of Plaintiff's clearly established rights, used their offices to violate Plaintiffs' Fourteenth Amendment rights.

217.    Plaintiff ten-year-old A.M. is a member of a protected class, specifically being a female, member of a protected class and she was intentionally and purposefully discriminated against because of her membership in that protected class.

218.    Furthermore, the Board and individual capacity Defendants engaged in both (1) a disparate treatment of one class of students (female students) including by whitewashing such complaints, as occurred here, who complain about bullying as compared to other classes of students (male students), *see Soper v. Hoben*, 195 F.3d 845, 852 (6th Cir. 1999), and (2) Defendants have engaged in deliberate indifference to discriminatory peer harassment. *Stiles v. Grainger County*, 819 F.3d 834, 851-52 (6th Cir. 2016)

219.    It was the policy or custom of the Board and the individual capacity Defendants, to provide less protection to victims of sexual assault, threatened sexual assault, and/or threatened sexual harassment, than other school offenses, and gender discrimination was the motivation for this disparate treatment, and the severe, pervasive harassment here, to include threats of sexual assault, undermined and detracted from A.M.'s educational experience and she was denied equal access to the Carroll County school system's resources and opportunities.. This violated clearly established law as set forth in *Stiles*, 819 F.3d 834, 851-52; *Doe v. City of Memphis*, 928 F.3d 481 (6th Cir. 2019), and *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009).

220.    The foregoing violations of the Fourteenth Amendment proximately and actually caused A.M. damages, to include pecuniary damages resulting from A.M. needing to see a therapist, loss of educational opportunities, and other damages to include humiliation and emotional distress, exceeding $50,000 in an amount to be proven at trial.

221.    The Board is liable for such damages under *Monell*, including for the reasons set forth in Paragraph 190.

222.    Jaynes, McIntyre, Stevens, and Stephenson, as well as John and Jane Doe Defendants 1-5 are individually liable for punitive damages, in an amount to be proven at trial, because their

actions were motivated by evil motive or intent, and because their actions involved reckless or callous indifference to the federally protected rights of Plaintiff.

223.    Defendants are all liable for attorney fees and costs pursuant to 42 U.S.C. § 1988.

### CLAIM III – Student-on-Student Harassment (Title IX claims against the Defendant Board and Defendants in their official capacities)

224.    Plaintiffs reincorporate the preceding paragraphs as if fully set forth herein.

225.    Defendant Carroll County Schools is a recipient of federal education funds, making them subject to the requirements of Title IX, 20 U.S.C. §§ 1681-1688 and *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979).

226.    T.H.'s threatened sexual assault and sexual harassment of A.M., along with his "Diddy Party" group chat where he and other students talk about "fucking and raping" A.M. and other 5th grade girls, the imitation of A.M. on SnapChat by L.G. at the behest of T.H., and the continued harassment and humiliation campaign is sexual harassment and threatened assault that is so severe, pervasive, and objectively offensive that it could be said to deprive A.M. of access to the educational opportunities or benefits provided by the school.

227.    In fact, T.H.'s conduct actually did deprive A.M. of educational opportunities and benefits, including disrupting her attendance at the school dance, disrupting her ability to attend class, and leading to the school removing her from the classroom without giving her classwork or any means to obtain classwork for several days.

228.    The Defendant Board, as well as Defendants Jaynes, McIntyre, Stevens, and Stephenson, in their official capacities, had actual knowledge of the ongoing sexual harassment and threatened assault, and had actual knowledge since at least January 30, 2025.

229.   Through Defendant Board, as well as Defendants Jaynes, McIntyre, Stevens, and Stephenson's, in their official capacities, inaction against T.H., and punishment of A.M. by removing her from the classroom instead of T.H., retaliating against her mother, Sherry, and banning Sherry from school grounds – resulting in A.M. being deprived of her mother in times of need, including when A.M. needed her medications – the Defendants' response was clearly unreasonable in light of the known circumstances, thus demonstrating the Defendant Board, and Defendants Jaynes, McIntyre, Stevens, and Stephenson in their official capacity, were deliberately indifferent to the harassment, and in fact fostered an environment that encouraged the sexual harassment and threatened assault of A.M. to continue, and were deliberately indifferent to the foreseeability of further actionable harassment of the victim.

230.   The foregoing violations of Title IX proximately and actually caused A.M. damages, to include deprivation of access to the educational opportunities and benefits provided by the school, pecuniary damages resulting from A.M. needing to see a therapist, exceeding $5,000 in an amount to be proven at trial.

231.   For the avoidance of all doubt, (i) The Board was the recipient of federal funds and was therefore subject to Title IX, (ii) the Board had actual knowledge of the harassment that A.M. suffered, and (3) the harassment was severe, pervasive, and objectively offensive.

232.   These injuries are attributable to the post-actual-knowledge further harassment which would not have happened but for the clear unreasonableness of the school's response, namely the punishing of Plaintiffs instead of T.H. and those who continued the harassment of A.M., resulting in a response that brought about and failed to protect against the further harassment.

233.   Further, Plaintiffs seek prospective injunctive relief, including the following: (i) an injunction requiring the Defendant Board and the official capacity Defendants to revise and

implement Title IX and its implementing regulations as required by law; (ii) an injunction requiring the Defendant Board and the official capacity Defendants to appropriately protect A.M. against ongoing sexual harassment.

234.    The Defendant Board and official capacity Defendants are liable for attorney fees and costs pursuant to 42 U.S.C. § 1988.

## CLAIM IV – Title IX Retaliation (Title IX claims against the Defendant Board and Defendants in their official capacities)

235.    Plaintiffs reincorporate the preceding paragraphs as if fully set forth herein.

236.    Sherry engaged in protected activity under Title IX, namely by filing the February 18, 2025 Title IX complaint with the Defendant Board, in response to the sexual harassment and threatened sexual assault, attempted rape, and ongoing harassment campaign against A.M.

237.    As Plaintiffs were actively complaining of alleged discrimination on the basis of sex under Title IX, Plaintiffs clearly engaged in clearly established protected conduct.  *Doe v. Belmont Univ.*, 367 F. Supp. 732, 756-57 (M.D. Tenn. 2019); *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013); *see also Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2008).

238.    The Board Defendant and Official Capacity Defendants knew of the protected activity, as the Board received the complaint through Defendant Stevens, and improperly dismissed the complaint, as well as retaliated by banning Sherry from school grounds.

239.    Defendants retaliated against Plaintiffs A.M. and Sherry in response to this protected conduct, through adverse school-related action.

240.    Specifically, Defendants took adverse actions against A.M., including revoking her access to the classroom, refusing to furnish schoolwork to her, and putting her in a classroom with T.H. while knowing that she was traumatized by his presence after he sexually harassed and

36

threatened to rape her, and refusing to intervene in the ongoing harassment campaign, all in retaliation for the foregoing protected conduct.

241.    Defendants took adverse action against Sherry, by banning her from school grounds, including extracurricular activities of her children, all in retaliation for the foregoing protected activities.

242.    These actions were sufficiently severe to dissuade a reasonable person from engaging n the protected activity. *Doe v. Univ. of Ky.*, 111 F.4th 705, at *7 (6th Cir. 2024) (citing *Hubbell v. FedEx SpartPost, Inc.*, 933 F.3d 558, 569-70 (6th Cir. 2019)).

243.    The foregoing violations of Title IX proximately and actually caused A.M. damages, to include deprivation of access to the educational opportunities and benefits provided by the school, pecuniary damages resulting from A.M. needing to see a therapist, exceeding $5,000 in an amount to be proven at trial.

244.    These injuries are attributable to the post-actual-knowledge further harassment which would not have happened but for the clear unreasonableness of the school's response, namely the punishing of Plaintiffs instead of T.H. and those who continued the harassment of A.M., resulting in a response that brought about and failed to protect against the further harassment.

245.    Defendant Board and the official capacity Defendants are liable for attorney fees and costs pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as prayed for, including:

A. That Plaintiffs be awarded preliminary and permanent declaratory and injunctive relief, reinstating Sherry's right of access to school grounds;

B. That Plaintiffs be awarded money damages, including both compensatory and punitive damages under § 1983, against the individual capacity Defendants, in an amount to be proven at trial, and exceeding $50,000.00, exclusive of interest and costs;

C. That Plaintiffs be awarded compensatory money damages under § 1983 against the Board Defendant, under *Monell*, in an amount to be proven at trial, and exceeding $50,000.00, exclusive of interest and costs;

D. That Plaintiffs be awarded compensatory damages under Title IX in an amount exceeding $5,000 in an amount to be proven at trial.

E. That Plaintiffs be awarded prospective injunctive relief under Title IX and § 1983 against the Board and official capacity Defendants, to including, without limitation, (i) an injunction requiring the Defendant Board and the official capacity Defendants to revise and implement Title IX and its implementing regulations as required by law; (ii) an injunction requiring the Defendant Board and the official capacity Defendants to appropriately protect A.M. against ongoing sexual harassment;

F. That trial by jury be had on all issues so triable;

G. That Plaintiffs be awarded their costs in this action, including reasonable attorney fees under 42 U.S.C. § 1988; and

H. Such other relief as this Court may find just and proper.

Respectfully submitted,

/s/Christopher Wiest _____
Christopher Wiest (KBA 90725)
Theodore J. Roberts (KBA 100610)
Chris Wiest, Attorney at Law, PLLC
50 E. Rivercenter Blvd, Ste. 1280
Covington, KY 41011
(513) 257-1895

(859) 495-0803 (fax)
tj@cwiestlaw.com
*Attorneys for Plaintiffs*

## JURY DEMAND

Pursuant to FRCP 38, Plaintiffs demand trial by jury for all causes so triable.

/s/Christopher Wiest _____
Christopher Wiest (KBA 90725)

<u>VERIFICATION</u>

Pursuant to 28 U.S.C. 1746, I, SHERRY MCLAUGHLIN, declare under penalty of perjury that I have read the foregoing Verified Complaint, and state that the factual statements therein are true and accurate to the best of my knowledge.

Executed on August 14, 2025.

SHERRY MCLAUGHLIN