IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY – FRANKFORT DIVISION

| | | |
|---|---|---|
| **SHERRY MCLAUGHLIN,** | : | Case No. 3:25-cv-00041 |
| in her individual capacity and as guardian | | |
| of A.M., a minor | : | |
| Plaintiffs | : | |
| v. | : | |
| **WILSON CLAY "CASEY" JAYNES**, *et. al.* | : | |
| *in his individual and official capacity* | | |
| | : | |
| Defendants | | |
| | : | |

### PLAINTIFFS' MOTION IN OPPOSITION TO DEFENDANTS' MOTION FOR A PROTECTIVE ORDER WITH THE DECLARATION OF SHERRI MCLAUGHLIN AND CHRISTOPER WIEST IN SUPPORT

Defendants have been sued for, among other things, retaliating against the Plaintiff for her social media and other criticisms of them. (Ver. Compl., Doc. 1). Those allegations include efforts they made to silence her. *Id.* Now they double down, and seek to have *this Court* enter an order to silence her and her Counsel, all in the face of serious, ongoing, harm to her minor daughter (included instances in recent weeks of threats of bodily harm to A.M., a ten-year old, in school). (Dec. McLaughlin). Law enforcement was recently called to the school by Plaintiff, because of Defendants' malfeasance and unwillingness to address these ongoing, currently occurring issues. *Id.* It should perhaps come as no surprise that the Defendants do not want *any* sort of public scrutiny of their misconduct. The First Amendment and case law prohibits, twice-over, the relief they seek.

It bears noting that Plaintiffs agreed, via the meet and confer process, to do what the law requires – that is, keep any disclosures to the media or public consistent with those permitted by

1

SCR 3.130(3.6),¹ to abide any confidentiality/protective orders entered in this case, and to not disclose the names of any minors involved in the underlying issues. (Dec. Wiest). But those agreements were not sufficient for Defendants; Defendants seek a one-sided *carte blanche* order from this Court, completely silencing the Plaintiff (even for additional misconduct), and her counsel from *any* public statements about this case, the ongoing abuse of her daughter (and other minor students) or the Defendants at all (while ostensibly leaving Defendants free to make public disclosures). (Def.'s Motion, Doc. 8). As Mr. Wiest's declaration outlines, Mr. Casey Jaynes has not been silent about this matter on social media and otherwise. (Dec. Wiest). And so what they really seek is a viewpoint-based gag order. *Id.* Any lawyer that has had rudimentary dealings with the First Amendment should know better.

Their request is particularly stunning, when one considers that the Defendants in this case are a public school district and public government officials, where First Amendment protection and criticism is at its highest. Private citizens, "have a First Amendment right to criticize public officials and to be free from retaliation for doing so." *See Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010) (*citing Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994)). It is especially problematic when Defendant Jaynes, the Superintendent, issued public emails and statements to district personnel following the filing of this case himself talking publicly about it. (Dec. Wiest).

---

¹ Those limitations permit some discussion of cases. And to that end, the United States Department of Justice complies with those limitations when it issues routine press releases over charging decisions. See, e.g., https://www.justice.gov/usao-edky/pr/justice-department-announces-results-operation-restore-justice-more-205-alleged-child ; https://www.justice.gov/usao-edky/pr/lee-county-man-indicted-and-detained-armed-drug-trafficking

I.  **FACTUAL BACKGROUND OF THIS CASE**

In the end of January, 2025, A.M., Plaintiff's 10-year-old daughter, was threatened with sexual assault and rape at a middle school dance in the Carroll County Middle School. (Ver. Compl., Doc. 1, at ¶¶ 15-66). Complaints were immediately made by A.M. and her mother to faculty and law enforcement. *Id.* In response, and in the days and weeks that followed, Defendants took action to retaliate against A.M. (*Id.* at ¶¶ 72-84, 91-95, 141-144).

In response, the primary perpetrator escalated his behavior, creating a "Diddy Party"[2] group that discussing "raping and fucking" his ten-year-old female classmates, with his friends to discuss and plan the sexual harassment of A.M. and other minor females. (*Id.* at ¶¶ 86-90, 110-112). This was also reported to Defendants. *Id.* The sexual harassment at school continued to escalate, despite steps by Plaintiff to have Defendants separate A.M. from the perpetrators. *Id.* Defendants did nothing for weeks, before grudgingly separating in class (but not in hallways or otherwise) A.M. from those perpetrating the abuse upon her. *Id.* And yet, again, the abuse did not stop. *Id.*

Plaintiff then took to social media to criticize Defendants for their handling of the sexual misconduct. *Id.* at ¶¶ 98-99, 148-149, 151, 153, 155-156. In response, Defendants starting in February, 2025 and in the months that followed (to the present), began monitoring Plaintiff's social media, and communications between them reveal a concerted effort to retaliate against Plaintiff and silence her, for her continued reports of abuse towards her daughter and Defendants handling of same. *Id.* at ¶¶ 98-99, 151, 152, 153, 155, 188. Tellingly, the entire basis of

---

[2] As the Verified Complaint indicates, this was in reference to Sean "Diddy" Combs, who was well-known for his own sexual misconduct, resulting in federal convictions for sexual-related misconduct. *See, e.g., United States v. Combs*, SDNY Case No. 1:24-cr-00542.

Defendants' current motion is a continuation of that activity of attempting to silence the Plaintiff regarding Defendants' misconduct.

On February 18, 2025, Plaintiff formally filed a Title IX complaint with school officials, which they were quick to brush under the carpet and dismiss. *Id.* at ¶¶ 141, 150.

After all of this activity by Defendants, they decided to ban Plaintiff from Plaintiff being on school grounds, under non-sensical and baseless allegation of supposed harassment towards Defendant McIntyre for calling her "you're nothing but a rude twat." *Id.* at ¶¶ 159-170.

Plaintiff has filed a four count complaint alleging (i) First Amendment retaliation and conspiracy to retaliate; (ii) an equal protection violation grounded in sexual harassment; (iii) a Title IX count; and (iv) a Title IX retaliation count. *Id.*

## II.    DEFENDANTS' REQUEST FOR AN AGREED GAG-ORDER AND PLAINTIFFS' RESPONSE

Defendants generally seek a blanket, wide-ranging, gag order. (Motion, Doc. 8). Most of what the Defendants take issue with are the allegations in the Verified Complaint or discussion of them (or more so the evidence that the Verified Complaint constitutes)[3] and the press reporting of it. (Motion, Doc. 8; Ver. Compl.). They appear to allege that brief comments on social media or the press by Plaintiffs' Counsel about the case was somehow problematic (but beyond disseminating the news story, it is difficult to understand how that is the case). (Motion, Doc. 8).

Defendants also seem to take issue with the Plaintiff making a post to social media after her daughter was <u>again</u>, post-filing, abused in school and threatened with bodily harm by the

---

[3] *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

very perpetrator who threatened to rape her in January, 2025, all in recent, weeks, causing the need for A.M.'s emergency anxiety counseling. (Decl. McLaughlin).

As Mr. Wiest's email to Defense Counsel cogently explained: Defendants "seem far more interested in censoring speech, versus alleviating threats of bodily harm, ongoing sexual harassment, witness intimidation, and harassment of my client, which apparently your clients are more than happy to at least permit, if not encourage." (Decl. Wiest, Exhibit 1).

At bottom, however, all of this commentary is about and comes from the Verified Complaint itself;[4] and the more recent post by the Plaintiff herself that involves yet *another* incident that occurred post-filing.

Here, of course, the media reached out to the undersigned Counsel to ask for a comment, not the other way around. (Decl. Wiest). Further, the comment was in relation to the filing of a verified complaint and the allegations within it. *Id.* And Mr. Roberts' comments were in response to a comment about the allegations that he prefaced were in connection with the complaint and allegations. *Id.* Mr. Wiest made a relatively innocuous statement on social media that indicated that the claims were substantiated with a verified complaint and happened. *Id.*

Mr. Wiest told Defendants that Plaintiffs would keep any disclosures to the media or public consistent with those permitted by SCR 3.130(3.6), and to abide any confidentiality/protective orders entered in this case, and to not disclose the names of any minors involved in the underlying issues. (Dec. Wiest).

Mr. Wiest explains that it is not generally his firm's practice to issue press releases or to discuss the substance of the case unless there is some significant development and a media inquiry (i.e. a decision of a dispositive motion or a jury verdict) that warrants it. (Dec. Wiest).

---

[4] As explained below, all of the statements to date are within those permitted under SCR 3.130(3.6).

5

He explains that the press have told him that they monitor his filings, in particular, in the Eastern and Western Districts of Kentucky and the Southern District of Ohio; that it is not his practice to issue press releases other than occasionally with the filing of a complaint or a verdict in a case, but that no press release was issued here. (*Id.*).

And that occasionally, in a high profile or newsworthy case, he will receive a media inquiry about a particular filing, a procedural step in the case, scheduling in the case, and the like, and he typically will respond, consistent with disclosures permitted by SCR 3.130(3.6)(b). (*Id.*). No trial is presently set in this case, but, in Mr. Wiest's experience, trial settings in the Eastern District of Kentucky are at least a year from filing. (*Id.*). Defendants' attempts to silence such speech is improper and inconstant with Kentucky Rules of Professional Conduct SCR 3.130(3.6). (Decl. Wiest).

### III.     LAW AND ARGUMENT

Defendants begin by invoking FRCP 26(c). Yet FRCP 26(c) is limited to the context of discovery, not statements that a party or its Counsel make to the media. True, Defendants could utilize this rule to, for instance, limit the disclosure of materials exchanged in discovery, which would be wholly permissible. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984). But that is not what they seek to do.

They seek a wide-ranging, prior-restraint gag order, in no small part because they do not like the criticism they are facing for turning a blind eye towards sexual abuse hurled at a 10-year old minor female child – and when her mother pursued recourse for her, instead of addressing the issue, Defendants elected to instead retaliated against her for doing so. (Ver. Compl., Doc. 1).

Start here: Plaintiffs have agreed that Counsel will abide by the requirements of SCR 3.130(3.6),[5] and Plaintiff and Counsel will abide any confidentiality/protective orders entered in this case, and to not disclose the names of any minors involved in the underlying issues. (Dec. Wiest). And so the question is whether *additional restraint* of speech beyond this is permissible. It is not.

The United States Supreme Court, in *Nebraska Press Association v. Stuart*, 427 U.S. 539, 556 (1976) observed that "[t]he First Amendment provides that 'Congress shall make no law… abridging the freedom… of the press,' and it is 'no longer open to doubt that the liberty of the press, and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth

---

[5] SCR 3.130(3.6) provides: (a) A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.
(b) Notwithstanding paragraph (a), a lawyer may state:
(1) the claim, offense or defense involved and, except when prohibited by law, the identity of the persons involved;
(2) information contained in a public record;
(3) that an investigation of the matter is in progress;
(4) the scheduling or result of any step in litigation;
(5) a request for assistance in obtaining evidence and information necessary thereto;
(6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest;
…
(c) Notwithstanding paragraph (a), a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.

The commentary to the rule, available at: https://www.kycourts.gov/Courts/Supreme-Court/Supreme%20Court%20Orders/202211.pdf makes clear that *none* of the statements that Defendants complain about at present, are within the type of statements that are prohibited. Not only is any trial remote in time, but no statements relate to: "(a) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness; … (c) the performance or results of any examination or test or the refusal or failure of a person to submit to an examination or test, or the identity or nature of physical evidence expected to be presented; (e) information that the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial;"

Amendment from invasion by state action.'"  "The Court has interpreted these guarantees to afford special protection against orders that prohibit the publication or broadcast of particular information or commentary - orders that impose a 'previous' or 'prior' restraint on speech."  *Id.*  The *Stuart* Court then addressed the propriety of protective orders that were prior restraints on speech in the context of a criminal trial and the right to a fair trial.  *Id.*

Indeed, the Court began its analysis by observing that "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity."  *Id.*, citing *Carroll v. Princess Anne*, 393 U.S. 175, 181 (1968); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).  The Court further observed that "[t]he thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."  Moreover, "[t]he damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events."  *Id.*  "Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment."  *Id.*

The Supreme Court in *Stuart*, 427 U.S. 539 at 562-563 explained that the first inquiry was to determine whether there was an actual danger of an unfair trial because of media exposure (there in the context of wide publicity in a murder trial where the Fifth Amendment was also at play).  However, "pervasive, adverse publicity does not inevitably lead to an unfair trial." *Stuart*, 427 U.S. at 554.  Then, the *Stuart* Court explained that the trial court then had to move to the second part of the test and analyze "whether measures short of an order restraining all publication would have insured the defendant a fair trial."  *Id.* at 563.  The *Stuart* Court explained less restrictive measures that had to be considered prior to a prior restraint of speech order:

8

>Most of the alternatives to prior restraint of publication in these circumstances were discussed with obvious approval in *Sheppard v. Maxwell*, 384 U.S., at 357-362: (a) change of trial venue to a place less exposed to the intense publicity that seemed imminent in Lincoln County;  b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors, as Mr. Chief Justice Marshall used in the *Burr* case, to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court. Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pre-trial publicity and emphasizes the elements of the jurors' oaths.  *Id.* at 563-564.

In that case, the Supreme Court held that in order to suppress press commentary on evidentiary matters, the party seeking to suppress public statements would have to show that "further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." *Id.*, at 569.  Defendants cannot, and do not even pretend to meet the *Stuart* standard as to Mrs. McLaughlin.

Speech in connection with litigation "goes to the heart of [courts'] function under our system of civil liberty." *United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987). Thus, "any prior restraint on expression comes . . . with a heavy presumption against its constitutional validity." *Karhani v. Meijer*, 270 F.Supp.2d 926, 931-32 (E.D. Mich. 2003) (*quoting Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)). That heavy presumption may be overcome only when a content-based prior restraint (such as Defendants seek here) meets "the exacting 'clear and present danger' test for free speech cases." *Ford*, 830 F.2d at 598 (*citing Near v. Minnesota*, 283 U.S. 697, 51 S. Ct. 625, 75 L. Ed. 1357 (1931)).

According to the Sixth Circuit, a clear and present danger "must be specific, not general. It must be much more than a possibility or a 'reasonable likelihood' in the future. It must be a 'serious and imminent threat' of a specific nature, the remedy for which can be narrowly tailored

9

in an injunctive order." *Ford*, 830 F.2d at 600; *see also CBS Inc. v. Young*, 522 F.2d 234, 238-39 (6th Cir. 1975) (discussing *Chase v. Robson*, 435 F.2d 1059 (7th Cir. 1970)). Defendants do not even pretend to meet these standards. In fact, they do not even discuss them. Tellingly, the words "First Amendment" do not appear in their motion. That is hardly a surprise: if they understood or had any respect for the First Amendment, we would not be here to begin with. Yet it is particularly troubling when Defense Counsel were specifically warned that they should conduct research related to their prior-restraint and the First Amendment in the meet and confer process, and appear not to have done so. (Dec. Wiest, Exhibit 1).

Of course, counsel for parties (including Plaintiffs' Counsel) is subject to a different standard. Kentucky Rules of Professional Conduct SCR 3.130(3.6) provides: "(a) A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." Rule SCR 3.130(3.6)(b), then expressly permits disclosure of (1) the claim, offense or defense involved and, except when prohibited by law, the identity of the persons involved; (2) information contained in a public record; (3) that an investigation of the matter is in progress; (4) the scheduling or result of any step in litigation; (5) a request for assistance in obtaining evidence and information necessary thereto; (6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest;" And finally provides that "(c) Notwithstanding paragraph (a), a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement

10

made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity."

Courts in Kentucky addressing these standards, including in the context of a gag order of the sort that Defendants seek here acknowledge the serious First Amendment issues such an order presents. *63 S.W.3d 602 v. Hines*, 63 S.W.3d 602 (Ky. App. 1998). Thus, Kentucky Courts consider "the nature and extent of the publicity, including whether the information would be admissible at trial, whether the evidence is already generally known to the public, and whether the dissemination of the information would infringe the constitutional rights of the defendant." *Id.* at 607, *citing Ashland Publishing Co. v. Asbury*, Ky. App., 612 S.W.2d 749, 753 (1980).

Further, any sort of gag order must be narrowly tailored, cannot prohibit parties from stating what is already in the public domain, and cannot prohibit parties from criticizing government officials handling of the matter. *Id.*, *citing CBS, Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975). Moreover, prior to entry of any sort of gag order injunction which prohibits the dissemination of information by parties, counsel and witnesses, the court should hold an evidentiary hearing at which all potentially enjoined persons are given a right to be heard. *See Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996) (holding that *ex parte* orders restraining free speech have "no place" in the "First Amendment realm" where no showing is made that it is impossible to notify the interested parties and give them an opportunity to be heard). *See also Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1305-07, 103 S. Ct. 3524, 3526-27, 77 L. Ed. 2d 1284, 1287-89 (Brennan, Circuit Justice 1983) (granting stay of order prohibiting release of juror names and addresses where order was entered without a hearing and without findings of fact justifying it). The court should make clearly articulated

11

findings of fact addressing the probability that the defendant's right to a fair trial or his constitutional rights would be irreparably damaged. *Young*, 522 F.2d at 239. The injunction must identify less restrictive alternatives for eliminating the prejudice, such as sequestration or *voir dire*, and explicitly state why they are inadequate in the present case. *In re Application of Dow Jones & Co.*, 842 F.2d 603, 611 (2d Cir. 1988). "Finally, the injunction must be narrowly drawn, and must address only those actions by counsel or witnesses which would materially prejudice the defendant's right to a fair trial." *James*, 63 S.W.3d 602.

The United States Supreme Court undertook a discussion of those limitations in *Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991). It explained that the "substantial likelihood of material prejudice" prong, "[i]nterpreted in a proper and narrow manner, for instance, to prevent an attorney of record from releasing information of grave prejudice on the eve of jury selection, the phrase substantial likelihood of material prejudice might punish only speech that creates a danger of imminent and substantial harm." *Id.* at 1036. The Court explained that "[p]roperly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Id.* Indeed, the "standard requires an assessment of proximity and degree of harm." *Id.* To that end, the Supreme Court observed that generally attorney comments made about a proceeding "six months before trial" does not meet the standard. *Id.*

*Gentile*, of course, involved not a smattering of social media posts or a response to a directed press inquiry, as was the case here, but a full-blown press conference. *Id.* at 1043. Indeed, the Court observed that "[o]nly the occasional case presents a danger of prejudice from pretrial publicity." *Id.* at 1054. "Empirical research suggests that in the few instances when

12

jurors have been exposed to extensive and prejudicial publicity, they are able to disregard it and base their verdict upon the evidence presented in court." *Id.* at 1054-1055. "Voir dire can play an important role in reminding jurors to set aside out-of-court information and to decide the case upon the evidence presented at trial." *Id.*

Thus, only (1) comments that will likely influence the outcome of a trial and (2) statements that will prejudice the jury venire even if an untainted jury panel can eventually be found, can be prohibited. *See, Gentile*, 501 U.S. at 1075.

As the Southern District of Ohio observed, however, different considerations are at issue in civil litigation than in criminal litigation, where the First Amendment and Fifth Amendment are in tension. *Wachsman v. Disciplinary Counsel Supreme Court*, 1991 U.S. Dist. LEXIS 20899 (SDOH 1991). The Court observed the holding in *Hirschkop v. Snead*, 594 F.2d 356 (4th Cir. 1979) (en banc) that suggested no restrictions were appropriate in civil matters. And the Court observed the same holding in *Shadid v. Jackson*, 521 F. Supp. 85 (E.D. Tex. 1981). The Court also observed that the Sixth Circuit Court of Appeals has noted that broad restrictions on speech regarding litigation are seldom justified. *United States v. Ford,* 830 F.2d 596, 599 (6th Cir. 1987). In fact, the *Wachsman* Court noted:

> Trial judges, the government, the lawyers and the public must tolerate robust and at times acrimonious or even silly public debate about litigation. The courts are public institutions funded with public revenues for the purpose of resolving public disputes, and the right of publicity concerning their operations goes to the heart of their function under our system of civil liberty.

The Court also observed that:

At the outset, this Court must express its agreement with the Fourth and Seventh Circuit Courts of Appeals that there are several significant differences between criminal and civil proceedings. In civil litigation, the Seventh Amendment guarantees only a "trial by jury" whereas in criminal litigation, the Sixth Amendment guarantees an "impartial jury." Accordingly, this impartial jury requirement in criminal proceedings justifies restrictions on attorney speech in criminal litigation which would not be justified in civil

13

proceedings. Moreover, the length of civil litigation tends to be much more prolonged than criminal litigation due to the priority granted to criminal matters by the judicial system because of the constitutional right to a speedy trial. Likewise, discovery in civil litigation is much more extensive than the discovery which is permitted in criminal litigation. Hence, restrictions on attorney speech in connection with civil litigation may result in a more serious loss of First Amendment rights than restrictions in connection with criminal litigations. Finally, civil proceedings may involve significant social issues which should not be hidden from the public. As noted by the court in the *Chicago Council* case, the attorney is often the one who will have knowledge regarding the need for governmental action or correction and the attorney may also be the only one who realizes the significance of such knowledge. *Chicago Council,* 522 F.2d at 258. **Thus, for the benefit of the public, a court must be extremely careful to protect attorney communications in connection with civil litigation.** *Id.* at *28-*29.

The Sixth Circuit Court of Appeals was clear that the sort of order sought by Defendants here is impermissible, and it declined to approve a prior restraint on speech by the parties or their counsel in the Kent State civil litigation. *CBS Inc. v. Young,* 522 F.2d 234, 239-41 (6th Cir. 1975) (per curiam). The Sixth Circuit in *Young* found that: "as the authorities demonstrate, any restrictive order involving a prior restraint upon First Amendment freedoms is presumptively void and may be upheld only on the basis of a clear showing that an exercise of First Amendment rights will interfere with the rights of the parties to a fair trial." *Id.* at 241. The court thus found it constitutionally impermissible a trial court order that restrained all parties concerned with the litigation from discussing the litigation with any member of the news media or the public. *Id.* at 236, 239-41.

Other Courts (in this Circuit and out of it) have addressed similar requests for gag orders to those made by Defendants here, and, as it turns out, <u>none of them</u> support the requested relief here.

Earlier this year, in *Lyoya v. Schurr*, 2025 U.S. Dist. LEXIS 98241 (MIWD 2025) took up a request for a gag order. In that case, one with far more media exposure than the present matter, the Defendant came to the Court with evidence of "news articles, Plaintiff's counsel's

14

Facebook posts, and a photo of a public billboard demanding justice for Plaintiff." *Id.* at *2. The Court denied the request, stating that "[t]he trial in this case is still over a year away, which makes it unlikely that a jury pool will be tainted by statements from 2022 and 2023." *Id.* at *3. "Second, these somewhat dated potential biases can be addressed through jury selection if necessary." *Id.* "Applying the standards of the professional rules and *Gentile*, this court cannot conclude Defendant Schurr will face a substantial likelihood of material prejudice in the case before this court based on the existing record as of today's date." *Id.*

Similarly, in *Sherrod v. VNA*, 2022 U.S. Dist. LEXIS 194969 (MIED 2022) a Defendant sought to silence (and sanction) Plaintiff's Counsel for media statements at a press conference. The Court observed that commentary of filed pleadings did not trigger the publicity rules at all, because the attorney was discussing materials in the public record. The Court also observed that the statements at issue, made more than a year before trial, and could be dealt with via a few questions in *voir dire*, did not raise issues under the rules.

Here, of course, the media reached out to the undersigned Counsel to ask for a comment, not the other way around. (Decl. Wiest). Further, the comment was in relation to the filing of a verified complaint. *Id.* And Mr. Roberts' comments were in response to a comment about the allegations that he prefaced were in connection with the complaint and allegations. *Id.* Mr. Wiest made a relatively innocuous statement on social media that indicated that the claims were substantiated with a verified complaint and happened. *Id.* All of that, of course, was commentary about what was in the public record.

Mr. Wiest told Defendants that Plaintiffs would keep any disclosures to the media or public consistent with those permitted by SCR 3.130(3.6), and to abide any confidentiality/protective orders entered in this case, and to not disclose the names of any minors

15

involved in the underlying issues. (Dec. Wiest). Mr. Wiest explains that it is not his firm's practice to issue press releases or to discuss the substance of the case unless there is some development (i.e. a decision of a dispositive motion or a jury verdict) that warrants it. (Dec. Wiest).

Mr. Wiest explains that the press have told him that they monitor his filings, in particular, in the Eastern and Western Districts of Kentucky and the Southern District of Ohio; that it is not his practice to issue press releases other than occasionally with the filing of a complaint or a verdict in a case, but that no press release was issued here. (*Id.*). And that occasionally, in a high profile or newsworthy case, he will receive a media inquiry about a particular filing, a procedural step in the case, scheduling in the case, and the like, and he typically will respond. (*Id.*). Defendants' attempts to silence such speech is improper and inconstant with Kentucky Rules of Professional Conduct SCR 3.130(3.6)(b), and violative of the First Amendment here.

It finally bears noting that it appears what Defendants are most upset about is the public reaction to the verified complaint allegations themselves. (Motion, Doc. 8). Of course, when adults turn a blind eye to ongoing sexual harassment and threats of rape in a middle school, involving a female, 10-year-old victim – and instead take action to punish the mother for making a complaint about it, public backlash and calls for accountability should be expected. (Ver. Compl.). And if Defendants are upset that the public wants their employment terminated as a consequence of their own misconduct, the appropriate response is to address the underlying issues, rather than attempt to silence those who reported it. This litigation involves claims about Defendants' prior efforts to silence the Plaintiff and punish her for protected speech – which apparently continues, now with the assistance of Defense Counsel. (Ver. Compl.). The irony should not be lost on the Court.

## IV.   CONCLUSION

Defendants' request for a one-sided gag order, all a continuation of the very First Amendment retaliation that landed us here in the first place, should be denied. It is inconsistent with case law and the First Amendment.

                          Respectfully submitted,

/s/Christopher Wiest
Christopher Wiest (KBA 90725)
Theodore J. Roberts (KBA 100610)
Chris Wiest, Attorney at Law, PLLC
50 E. Rivercenter Blvd, Ste. 1280
Covington, KY 41011
(513) 257-1895
(859) 495-0803 (fax)
tj@cwiestlaw.com
*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon all Counsel of record by filing same via CM/ECF, this 18 day of September, 2025.

/s/Christopher Wiest
Christopher Wiest (KBA 90725)